UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

CATHOLIC HEALTHCARE WEST,            :
                                     :
            Plaintiff,               :
                                     :
        v.                           : Civil Action 11-459 (GK)
                                     :
KATHLEEN SEBELIUS, in her            :
official capacity as Secretary       :
of Health and Human Services,        :
                                     :
            Defendant.               :
_____

<u>MEMORANDUM OPINION</u>

Plaintiff, Catholic Healthcare West ("CHW"), brings this action against Defendant Kathleen Sebelius, Secretary of the U.S. Department of Health and Human Services (respectively, the "Secretary" and "HHS"), pursuant to Title XVII of the Social Security Act, 42 U.S.C. §§ 1395 <u>et seq.</u> ("the Medicare Act"). CHW seeks judicial review of a final agency decision denying Marian Medical Center's ("Marian") reimbursement claim arising from the merger of Marian, Mercy Healthcare Ventura County ("Mercy"), and CHW.[1]

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Dkt. No. 14] and Defendant's Motion for Summary Judgment [Dkt. No. 15]. Upon consideration of the parties' cross-motions, the administrative record, and the

_____

[1] CHW is the successor in interest to Marian.

entire record herein, and for the reasons stated below, Plaintiff's Motion for Summary Judgment is **denied** and Defendant's Motion for Summary Judgment is **granted**.

## I.   BACKGROUND

On March 15 1997, Marian entered into an Agreement of Merger with Mercy, a two-hospital system whose sole corporate member was CHW. Administrative Record ("A.R.") 20, 409. CHW is a Catholic healthcare system co-sponsored by several Catholic women's religious orders. Id. at 20. CHW oversees and coordinates the activities of a healthcare system consisting of over 30 acute care hospitals in California, Arizona, and Nevada. Id. Marian was a general acute care hospital located in Santa Maria, California. Id. Marian was owned and operated by the Sisters of St. Francis of Penance and Christian Charity, St. Francis Province ("Sisters of St. Francis"). Id. The merger between Marian, Mercy and CHW became effective April 24, 1997. Id. at 20, 411, 413-14, 493-95. Mercy, renamed CHW-CC, remained as the surviving corporation. Id. at 20, 411, 413-14.

### A.   Statutory and Regulatory Framework

Congress created the Medicare program in 1965 to pay for certain specified, or "covered," medical services provided to eligible elderly and disabled persons. See 42 U.S.C. §§ 1395 et seq. Under the program, health care providers are reimbursed for a portion of the costs that they incur treating Medicare

beneficiaries pursuant to an extremely "complex statutory and regulatory regime." Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 404 (1993). That regime is administered by the Centers for Medicare & Medicaid Services ("CMS"), under the supervision of the Secretary. CMS contracts with a network of fiscal intermediaries to review and process Medicare claims in the first instance.

The Medicare Act provides for reimbursement of the "reasonable cost of [Medicare] services." 42 U.S.C. § 1395f(b)(1). "Reasonable" costs are those "actually incurred . . . [as] determined in accordance with regulations." 42 U.S.C. § 1395x(v)(1)(A). Under the Secretary's regulations in effect at the time of the transaction at issue, "[a]n appropriate allowance for depreciation on buildings and equipment used in the provision of patient care [was] an allowable cost." 42 C.F.R. § 413.134(a)(1997).[2] The costs are calculated by dividing the asset's purchase price by its "estimated useful life" and then prorating this amount by the percentage of the asset's use dedicated to Medicare services. 42 C.F.R. §§ 413.134(a)(3), (b)(1). Medicare reimburses providers for these depreciation costs on an annual basis.

---

[2] Since the merger at issue took effect on April 24, 1997, the Court, like the parties, will refer to the regulations as designated in the 1997 C.F.R., unless otherwise stated.

The Secretary determined that certain disposals of depreciable assets may give rise to recognition of a "gain" or "loss." That figure effectively adjusts the annual Medicare depreciation payments to more accurately reflect the actual cost of providing covered services to Medicare beneficiaries. Entities that were Medicare providers prior to statutorily merging with an unrelated party are able to recoup gains and losses from the merger subject to 42 C.F.R. § 413.134(f). Subsection (f) allows providers to request reimbursement for the difference between the "net book value"[3] and the compensation actually received in exchange for assets disposed of prior to December 1, 1997.[4] 42 C.F.R. § 413.134(f)(1). Subsection (f)(2) permits the inclusion of "gains and losses realized from the bona fide sale ... of depreciable assets" in the determination of allowable cost. 42 C.F.R. § 413.134(f)(2).[5]

---

[3] "Net book value" is the remaining value of an asset after depreciation costs are deducted. 42 C.F.R. § 413.134(b)(9).

[4] In 1997, Congress amended the Medicare Act to eliminate depreciation adjustments for assets after December 1, 1997. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404, 111 Stat. 251, 400 (1997).

[5] In addition to the gain or loss regulation at 42 C.F.R. § 413.134(f), the Secretary's regulations address "[t]ransactions involving a provider's capital stock. See 42 C.F.R. § 413.134(l)(1997)(now substantively modified and recodified at 42 C.F.R. § 413.134(k)). The capital stock regulation, also referred to as the statutory merger regulation, specifies that providers that transfer assets pursuant to a statutory merger are "subject to the provision of paragraph[] . . . (f) of [42

The Secretary issued Program Memorandum ("PM" or "Memorandum") A-00-76 in order to clarify the application of 42 C.F.R. § 413.134(l), the statutory merger regulation, to non-profit providers. PM A-00-76 (Oct. 19, 2000) (A.R. 1676-79). The Memorandum describes the "related organizations" and "bona fide sale" standards under which mergers between non-profit organizations should be analyzed. Id.

As to "related organizations," PM A-00-76 notes that consideration should be given to continuity of control, or the degree to which the pre-merged entities continue to exercise control over the post-merger entity. Id. As to "bona fide sale," the Memorandum defines that term as an arm's length transaction for reasonable consideration. Id. PM A-00-76 explains that "a large disparity between the sales price (consideration) and the fair market value of the assets sold indicates the lack of a bona fide sale." Id. The Memorandum recommends reviewing "the allocation of the sales price among the assets sold" to help determine whether a bona fide sale took place. Id.

PM A-00-76 explains that its effective date is not of consequence because it clarified, rather than changed, existing policy. Accordingly, the Memorandum concludes by stating that it should be applied to "all cost reports for which a final notice

---

C.F.R. § 413.134] concerning . . . the realization of gains and losses." 42 C.F.R. § 413.134(l)(2)(i).

of program reimbursement has not been issued and to all settled cost reports that are subject to reopening . . . ." Id.

**B.    Procedural Background**

Marian claimed a loss on the disposal of assets on its final Medicare cost report for the hospital's fiscal year ending April 24, 1997. A.R. 65. On August 12, 1999, the fiscal intermediary engaged by the Secretary to administer the Medicare program denied Marian's claim for reimbursement. Id. at 1723-27, 1861-64.

Marian appealed the fiscal intermediary's determination to HHS' Provider Reimbursement Review Board ("PRRB"). On November 3, 2010, the PRRB affirmed the intermediary's denial of Marian's claim. Id. at 33-46. The PRRB concluded that the large disparity between the consideration received and the fair market value of the assets acquired indicated a lack of reasonable consideration and, therefore, the lack of a bona fide sale. Id. at 46. Having determined that there was no bona fide sale, the PRRB held that payment for the claimed loss on disposal of assets was not allowable. Id. The PRRB also concluded that the parties were not related. Id. 39, 43.

The CMS Administrator, who has the discretion to review any final decision of the PRRB, chose to review the PRRB's denial of Marian's claim. Id. at 2-25. On January 4, 2011, the CMS Administrator issued her decision and determined that, based on

the cost appraisal approach, Marian transferred cash, cash equivalent assets, plant, and equipment worth approximately $67 million (comprised of cash and cash equivalent assets worth approximately $15.9 million and plant and equipment worth approximately $51.1 million) in exchange for the assumption of liabilities worth approximately $32.7 million. Id. at 22. Based on these figures, the CMS Administrator concluded that the merger did not qualify as a bona fide sale because Marian never sought and did not receive reasonable consideration for the transfer of its depreciable assets. Id. at 21-22. Like the PRRB, the CMS Administrator held that Marian was "not entitled to reimbursement for a loss on disposal of assets . . . ." Id. at 22.

The CMS Administrator also disallowed the loss-on-sale claim for a second, independent reason, i.e., that the merger was a related-party transaction. Id. at 22-24. The CMS Administrator explained that the PRRB "incorrectly concluded that the related party concept only applied to the entities['] relationship that existed prior to the merger" and that the principle in fact "applied to the parties' relationship pre and post merger." Id. at 22. Although the CMS Administrator noted that "the record is lightly developed with respect to whether [Marian] was related to the merged entity through a continuity of control and ownership," the Administrator nonetheless

concluded that there was sufficient evidence demonstrating that the parties were related. Id. 23-24. The CMS Administrator's decision constitutes the final decision of the Secretary and is now before this Court for review.

## II.  STANDARD OF REVIEW

The Medicare Act provides for judicial review of a final decision made by the Secretary. 42 U.S.C. § 1395 oo(f)(1). The Medicare Act instructs the reviewing court to apply the provisions of the Administrative Procedures Act ("APA"). Id. Under the APA, the agency decision can be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. §§ 702(2)(A), (2)(E).

"The arbitrary and capricious standard [of the APA] is a narrow standard of review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). It is well established in our Circuit that "[t]his court's review is . . . highly deferential" and that "we are 'not to substitute [our] judgment for that of the agency' but must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Bloch v. Powell, 348 F.3d 1060, 1070 (D.C. Cir. 2003) (citations omitted). Thus, even if this Court were to find "that other policies might better further the Secretary's stated objectives, [the Court is]

compelled to accept the policies and rules adopted by the Secretary so long as they have a rational basis, are reasonably interpreted, and are consistent with the underlying statute." Sentara Hampton Gen. Hosp. v. Sullivan, 980 F.2d 749, 755 (D.C. Cir. 1992).

The substantial evidence standard is satisfied if the final agency decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 619-20 (1966) (citation and internal quotation marks omitted); City of S. Bend, Ind. v. Surface Transp. Bd., 566 F.3d 1166, 1170 (D.C. Cir. 2009). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Consolo, 383 U.S. at 620 (citation omitted); S.E.C. v. Fed. Labor Relations Auth., 568 F.3d 990, 995 (D.C. Cir. 2009). Under this standard, a court may reverse the agency's findings "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." Orion Reserves Ltd. P'ship v. Salazar, 553 F.3d 697, 704 (D.C. Cir. 2009).

When an agency interprets its own rule or regulation, the interpretation "is entitled to the utmost deference." St. Luke's

Hosp. v. Sebelius, 662 F. Supp. 2d 99, 102 (D.D.C. 2009); see Ballard v. C.I.R., 544 U.S. 40, 70 (2005) ("An agency's interpretation of its own rule or regulation is entitled to controlling weight unless it is plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted). In the case of Medicare regulations, "[t]his broad deference is all the more warranted" because "the regulation[s] concern[] a 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)). Therefore, courts must defer to the Secretary's interpretation unless an alternative reading is "compelled by the regulation's plain language" or if the language is ambiguous, by "other indications of the Secretary's intent at the time of the regulation's promulgation." Thomas Jefferson, 512 U.S. at 512. The task of the reviewing court is to set aside only those agency interpretations that are affirmatively and plainly "inconsistent" with the regulation itself. Id.

**III.  ANALYSIS**

   A.   **The Secretary's Interpretation of "Bona Fide Sale" in PMA-00-76 Is Reasonable and Not Inconsistent with 42 C.F.R. § 413.134**

Plaintiff argues that the Secretary incorrectly relied on PM A-00-76's definitions of "related organizations" and "bona fide sale," because those definitions are contrary to the regulations.

As noted, supra, PM A-00-76 defines a "bona fide sale," as an arm's length transaction for reasonable consideration. A.R. 1676-79. The Memorandum explains that the absence of reasonable consideration indicates the lack of a bona fide sale. Id. PM A-00-76 elaborates on what constitutes reasonable consideration, stating that "[n]on-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care to the indigent, may not be taken into account in evaluating the reasonableness of the overall consideration (even where such elements may be quantified in dollar terms). These factors are more akin to goodwill than to consideration." Id.

PM A-00-76 further clarifies that when valuing assets, "the cost approach is the only methodology that produces a discrete indication of the value for individual assets . . . ." Id. By contrast, "[b]oth the market approach and the income approach produce a valuation of the business enterprise as a whole, without regard to the individual fair market values of the

constituent assets. As a result, both the market approach and the income approach could produce an entity evaluation that is less than the market value of the current assets."[6] <u>Id.</u> The Memorandum concludes that "the cost approach is the most appropriate methodology" for the <u>bona fide</u> sale analysis in the non-profit context. <u>Id.</u>

Plaintiff argues that PM A-00-76's prohibition against considering non-monetary factors in evaluating the reasonableness of consideration is inconsistent with Medicare regulations.[7] Plaintiff further argues that PM A-00-76's focus on

---

[6] The Secretary recognizes that, in other circumstances, including some cases interpreting the Internal Revenue Code and other types of commercial cases, the market and income approaches may be appropriate appraisal methodologies. <u>See</u> A.R. 17; Pl.'s Rep. at 8, 14-15 (citing cases and tax regulations). However, the Secretary is correct that "Medicare rules may diverge from IRS rule and Medicare policy is not bound by IRS policy[.]" A.R. 17.

[7] Plaintiff contends that, relying on PM A-00-76, the Secretary "erred in holding that the desire to maintain the religious mission of the hospital cannot be considered in determining whether the merger was for fair market value." Pl.'s Mot. for Summ. J. at 10. Plaintiff argues that under the Secretary's interpretation, "Marian could never have been sold for fair market value, because Marian's trustees were required by law to select a merger partner on the basis of adherence to the Catholic principles under which Marian was organized." <u>Id.</u> at 13.

However, as Defendant correctly points out "Plaintiff is mistaken that the Secretary's final decision held that Marian was incapable of entering into an arm's length transaction because of its religious affiliation" and that "non-profit providers, like for-profit providers, may engage in arm's length transactions even while prioritizing non-economic

the cost approach as the most appropriate methodology to be used in establishing the fair market value of assets is at odds with 42 C.F.R. § 413.134's definition of fair market value.[8] Pl.'s Mot. for Summ. J. at 13.

Plaintiff's arguments are not persuasive. The D.C. Circuit has unambiguously upheld the Secretary's interpretation of "bona fide sale" as memorialized in PM A-00-76. See St. Luke's Hosp. v. Sebelius, 611 F.3d 900, 906 (D.C. Cir. 2010) ("[W]e uphold the Secretary's interpretation of 42 C.F.R. § 413.134(f) and (l), memorialized in PM A-00-76, because it is not 'plainly erroneous or inconsistent with the regulation'"); see Forsyth Mem. Hosp. v. Sebelius, 639 F.3d 534, 537 (D.C. Cir. 2011) (summarily rejecting "a host of arguments that the [Secretary] should not have applied PM A-00-76[]" because the D.C. Circuit had "previously upheld PM A-00-76 insofar as [was] relevant").

---

considerations, so long as they bargain to receive reasonable economic consideration for the transfer of their assets and meet the other statutory and regulatory criteria." Def.'s Rep. at 11 [Dkt. No. 19].

[8] Plaintiff contends that fair market value, as defined by 42 C.F.R. § 413.134(b)(2)(1997), "is established if the following factors are present: (a) bona fide bargaining; and (b) well informed buyers and sellers." Pl.'s Mot. for Summ. J. at 13. Plaintiff further contends that "[p]rior cases interpreting the 'bona fide sale' provision at 42 C.F.R. § 413.134 have emphasized the centrality of arm's length bargaining in determining whether a bona fide sale occurred." Id. at 17. However, Plaintiff has failed to cite any Medicare cases where the Secretary applied a valuation methodology other than the cost approach.

Accordingly, the Secretary's interpretation of "bona fide sale," as memorialized in PM A-00-76, is reasonable, not plainly erroneous, and not inconsistent with prior agency statements.

**B.  The Secretary Appropriately Applied PM A-00-76 to the Merger at Issue**

Plaintiff argues that the Secretary "erred in implementing PM A-00-76 because it failed to publish timely notice of the same in the federal register as required by 42 U.S.C. § 1395hh(C)(1)." Pl.'s Mot. for Summ. J. at 30. Under the APA, however, notice and comment is not required for "interpretive rules" or "general statements of policy." 5 U.S.C. § 553(b)(3)(A). As PM A-00-76 is "an interpretation of an existing regulation [] [it] does not require notice and comment." Forsyth Mem. Hosp. v. Sebelius, 667 F. Supp. 2d 143, 150 (D.D.C. 2009); see also St. Luke's, 662 F. Supp. 2d at 104 (rejecting the argument that PM A-00-76 was subject to notice and comment and holding that "[n]or can there be any doubt that [PM A-00-76] is properly an informal interpretation").

Plaintiff additionally argues that PM A-00-76 was impermissibly retroactive. Pl.'s Rep. at 39 [Dkt. No. 18]. Plaintiff's retroactivity argument has been soundly rejected by the D.C. Circuit. See St. Luke's, 611 F.3d at 906-907 (finding "no impermissible retroactivity" with respect to the Secretary's application of PM A-00-76 to a merger effective as of January 1,

1997 and holding that "any potential retroactive effect was completely subsumed in the permissible retroactivity of the agency adjudication") (internal quotation marks omitted).

Accordingly, the Court concludes that the Secretary's application of PM A-00-76 to the merger at issue was appropriate.[9]

### C.   The Secretary's Finding that the Merger Was Not a Bona Fide Sale Was Supported by Substantial Evidence

Given the validity of the interpretation relied upon by the Secretary, the only question remaining is whether the Secretary's finding that the merger between Marian, Mercy and CHW was not a bona fide sale was supported by substantial evidence.

The Secretary based her decision, in part, on the large discrepancy between the consideration received for Marian's assets and the value of those assets. Plaintiff takes issue with the Secretary's use of Plaintiff's own cost approach appraisal[10]

---

[9]  In any event, even in the absence of PM A-00-76, the Secretary would have had the authority to interpret her own regulations in the context of a case-specific adjudication such as that which preceded this action. See St. Luke's Hosp. v. Sebelius, 611 F.3d 900, 907 (D.C. Cir. 2010) ("[The] Secretary generally may lawfully interpret a regulation . . . [w]ithin the context of an agency adjudication").

[10]  The appraisal relied upon by the Secretary was commissioned by Marian itself and conducted by Valuation Counselors Group, Inc. ("VCG"). See A.R. 729. The appraisal estimated the market value of Marian's assets using three approaches: cost, market and income. The cost approach valued Marian's assets at $51.1

to determine that reasonable consideration was not exchanged. Pl.'s Mot. for Summ. J. at 16-21; see A.R. 20-22.

The Secretary explained in her final decision why she relied upon the cost approach. A.R. 22. Her explanation is consistent with PM A-00-76, which, as discussed supra, has been upheld by the D.C. Circuit. Using the cost approach, the Secretary determined that $32.7 million, the approximate worth of Marian's liabilities, was not reasonable consideration for $67 million in assets.[11] That determination is not unreasonable and certainly does not reflect "a clear error of judgment."

_____

million, the market approach at $38.5 million, and the income approach at $28.5 million. Id. at 729-833.

[11] For the first time in its Reply, Plaintiff insists that the Secretary should evaluate the reasonableness of the consideration exchanged based on a valuation of Marian's assets at $35.28 million. The $35.28 million figure appears to be a blending of the VCG appraisal report's market and income approaches, though no clear explanation is given in the report as to how the appraiser calculated that figure. See Pl.'s Rep. at 9-10; see also A.R. 832. As PM A-00-76 explains, "the cost approach is the most appropriate methodology," for the bona fide sale analysis in the non-profit context.

Moreover, Plaintiff has failed to submit evidence that the cost approach does not accurately reflect the fair market value of the assets in question. Nor has Plaintiff adduced evidence as to how the alleged impairments in Marian's value (i.e., the alleged constructive trust and alleged need for seismic safety upgrades, see Pl.'s Mot. for Summ. J. at 10, 18-21) should be reflected in a downward adjustment to the assets' cost approach appraised value. Instead, Plaintiff simply insists that the Secretary should have used its preferred methodology. In any event, "absent extraordinary circumstances (not present here) [courts] do not entertain an argument raised for the first time in a reply brief." U.S. v. Wren, 111 F.3d 956, 958 (D.C. Cir. 1997).

<u>Bloch</u>, 348 F.3d at 1070; <u>see</u> <u>St. Luke's</u>, 611 F.3d at 905 ("It is logical [] to infer . . . that a 'large disparity' between the assets' purchase price and their fair market value indicates that the underlying transaction is not in fact <u>bona fide</u>").

Additional evidence that the parties did not engage in arm's length, self-interested bargaining supports the Secretary's finding as well. For instance, Marian appeared uninterested in maximizing the amount of consideration it would receive from the sale of its assets. This is evidenced by the fact Marian did not seek appraisal of its assets <u>prior</u> to the merger.[12] See A.R. 729-833 (The VCG appraisal report, the only appraisal in the Administrative Record, was not completed until February 22, 1999, nearly two years after the merger).

Marian also declined to place its assets for sale on the open market. <u>See</u> <u>Id.</u> at 84-85 (Marian's then-CEO and the Sisters of St. Francis explained, "[o]ne of the principal reasons we have focused on CHW is our firm belief that, with this group, we have the best assurance that the mission, presence, and sponsorship of the Sisters of St. Francis can be most effectively preserved and enhanced."); <u>id.</u> at 214-15. Instead, Marian was motivated by its desire to maintain the religious

---

[12] At the time of the merger, the only available information about Marian's fair market value with which the parties were working was a one-page attachment to the parties' Purchase Price Allocation Agreement that was based upon a February 28, 1997 unaudited financial statement "to be adjusted." See A.R. 301.

mission of the hospital. <u>See</u> Pl.'s Mot. for Summ. J. at 10-15. Although Marian's desire to maintain the religious mission of the hospital may be an important and worthwhile goal, such non-monetary considerations are "not indicative of parties engaged in self-interested bargaining with a focus on maximizing financial compensation." <u>Forsyth</u>, 667 F. Supp. 2d at 151. Thus, "[a party's] non-monetary motivations may not form the basis of a <u>bona fide</u> sale." <u>Id.</u>

The sizable gap between the "purchase price" and the value of Marian's assets, as well as the other circumstances surrounding the merger, constitute substantial evidence that supports the Secretary's finding that reasonable consideration was not exchanged, and that therefore, the merger was not a <u>bona fide</u> sale.

Because the Secretary's finding that the merger between Marian, Mercy and CHW was not a <u>bona fide</u> sale was an independent and adequate basis for denying Plaintiff's reimbursement claim, the Court need not address the Secretary's determination that the merger parties were related. <u>See</u> <u>Forsyth</u>, 639 F.3d at 539 (limiting its analysis to the <u>bona fide</u> sale issue "because it was an independent and sufficient ground for refusing appellants their requested reimbursement" and therefore declining to address the related parties issue); <u>Robert F.</u> <u>Kennedy Med. Ctr. v. Leavitt</u>, 526 F.3d 557, 563 (9th Cir. 2008)

(finding that because the "['<u>bona fide</u> sale'] issue is dispositive in this case, we do not reach the 'related parties' issue").

**IV. CONCLUSION**

For all of the reasons stated herein, Plaintiff's Motion for Summary Judgment is **denied** and Defendant's Motion for Summary Judgment is **granted**.


January 29, 2013      <u>/s/</u>_____
     Gladys Kessler
     United States District Judge


<u>Copies to</u>: attorneys on record via ECF

- 19 -